NO. 07-03-0200-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL C



AUGUST 4, 2003


______________________________



IN THE INTEREST OF DAE GENARO LEE GRADY QUINTANILLA, 


A MINOR CHILD




_________________________________



FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;



NO. 65,940-D; HON. DON EMERSON, PRESIDING


_______________________________





Memorandum Opinion


_______________________________



Before JOHNSON, C.J., and QUINN and REAVIS, JJ.

 Appellant Kristeen Quintanilla (Kristeen) filed a notice of appeal on May 7, 2003. 
However, she did not pay the $125 filing fee required from appellants pursuant to Texas
Rule of Appellate Procedure 5. Nor did she file an affidavit pursuant to Texas Rule of
Appellate Procedure 20, which may have relieved her of her duty to pay the fee. By letter
from this Court dated May 9, 2003, we informed Kristeen that "[f]ailure to pay the filing fee
may result in a dismissal." Tex. R. App. P. 42.3(c); see Holt v. F. F. Enterprises, 990
S.W.2d 756 (Tex. App.--Amarillo 1998, pet. ref'd). To date, the filing fee of $125 has not
been paid. Consequently, we dismiss the appeal pursuant to Texas Rule of Appellate
Procedure 42.3(c). Finally, our having disposed of the case as we do renders moot the
request by the Potter County Clerk's office for an extension of time to file the clerk's
record.


 Per Curiam 



w:CachedColBalance/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 









NO. 07-09-00344-CR; 07-09-00345-CR

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL B

 



FEBRUARY
24, 2011

 



 

ROBERT TIJERINA, APPELLANT

 

v.

 

THE STATE OF TEXAS, APPELLEE 



 



 

 FROM THE 64TH DISTRICT COURT OF HALE
COUNTY;

 

NO. A17408-0710; A17409-0710; HONORABLE ROBERT W. KINKAID JR., JUDGE



 



 

Before QUINN,
C.J., and CAMPBELL and HANCOCK, JJ.

 

 

OPINION

 

Appellant, Robert Tijerina,
was convicted of felony driving while intoxicated[1]
and leaving the scene of an accident involving injury.[2]  A jury assessed punishment, enhanced by prior
felony convictions, at 55 and 60 years, respectively, to run concurrently.  We will affirm.

 

Factual and Procedural History

            State
trooper Guadalupe DeLuna responded to a report of an
accident involving two vehicles, a Focus and a Cavalier.  The Focus was driven by Martina Beltran, who
was taken from the scene by ambulance. 
The driver of the Cavalier was not present when DeLuna
arrived, but the Cavalier was.  Also
present at the scene was Jonathan Rogers, a witness to the accident.  The missing driver had clipped Rogerss
motorcycle just before colliding with Beltran. 

            Rogers
had spoken to the missing driver after the accident for five to seven minutes.  Rogers explained that, despite his efforts to
direct the driver to stay at the scene, the driver had left on foot in a
northwesterly direction.  Rogers
described to DeLuna the drivers physical features
and clothing and observed that the driver appeared very intoxicated.  DeLuna testified
that, upon entering the unoccupied Cavalier, he could smell the lingering odor
of alcohol.  DeLuna
ran the license plate number, and it came back that the Cavalier was registered
to appellants father, Pablo Tijerina, whom DeLuna knew.  From
information gathered at the scene and from the description of the missing
driver, DeLuna thought he knew who the driver
was.  DeLunas
brother was acquaintances with a man who met witness Rogerss description and
regularly drove a Cavalier similar in style and color to the one at the
scene.  DeLuna
broadcast the information he had gathered to area law enforcement.

            DeLuna got Rogerss contact information, and Rogers
left.  Shortly thereafter, sheriffs
deputies called DeLuna to say that they had located a
man meeting the description provided at his residence.  That man was appellant.  Appellant refused to leave his house and
directed the officers to leave his property. 
DeLuna joined the deputies at appellants
residence.  DeLuna
called Rogers to come over to the residence, and Rogers looked into the
residence from about ten to fifteen feet.[3]  Looking through a window from a vantage point
in the yard, apparently somewhere between the circular drive and the residence
in question, Rogers unequivocally identified appellant as the missing driver.

            Prior
to trial, in January, June, and October 2008, appellant filed three separate
sets of motions to suppress, inter alia,
evidence of Rogerss pretrial identification resulting from the search of appellants
residence.  The trial court overruled the
January motions by written order.  New
counsel was appointed and filed the second and third sets of motions, each
being more specific than the previous motions. 
At the hearing on the later motions, the trial court noted the
evidentiary hearing on the first motions and summarily denied the later motions
to suppress.

            At
trial, appellant admitted that he had been drinking that day.  He denied, however, having used his fathers
car that day although he admitted to having driven it in the past.  The jury found him guilty of driving while
intoxicated and leaving the scene of an accident involving injury and assessed
punishment at 55 and 60 years, respectively, to be served concurrently.

            Appellant appeals, bringing two issues for the Courts
consideration.  First, he contends
that the trial court violated appellants rights under the Fourth Amendment and
article 38.23[4] by
denying his motion to suppress the identification when the search related to
the identification was an unjustified warrantless search of a dwelling.  Secondly, he contends that the trial court
violated appellants due process rights by admitting in-court identification
when such evidence was the product of an impermissibly suggestive show-up
procedure.

Search Leading to Pretrial
Identification

            In
his first issue, appellant argues that [t]he identification by Rogers used to
convict appellant was obtained by an impermissible warrantless search of a
dwelling, in the absence of exigent circumstances or any other legal means of
justifying the search.  Appellants
first point is premised on Rogerss act of peering through the window to
identify appellant constituting a search for Fourth Amendment purposes.  Appellant points out that he requested that
the officers leave the premises before the search occurred and contends that,
therefore, Rogers was trespassing when the identification occurred.

Standard and Scope of Review

            We
review the trial courts ruling on a motion to suppress evidence under a
bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673 (Tex.Crim.App.
2007).  We give almost total
deference to the trial courts rulings on questions of historical fact and
application-of-law-to-fact questions that turn on an evaluation of credibility
and demeanor, but we review de novo
application-of-law-to-fact questions that do not turn on credibility and
demeanor.  Amador,
221 S.W.3d at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex.Crim.App. 2005). 
When the trial court does not make a finding on a relevant fact, we view
the evidence in the light most favorable to the trial courts ruling and assume
the trial court made implicit findings of fact supported by the record.  Herrera v. State,
241 S.W.3d 520, 527 (Tex.Crim.App. 2007). 

            In
determining whether a trial courts ruling on a motion to suppress is supported
by the record, we generally only consider evidence adduced at the suppression
hearing because the trial courts ruling was based on that evidence rather than
evidence presented later at trial.  Rachal
v. State, 917 S.W.2d 799, 809 (Tex.Crim.App.
1996).  However, when the
suppression issue has been consensually re-litigated by the parties during the
trial on the merits, we may also consider relevant trial evidence in our
review.  See id.  Because it appears that the issues raised in
the motions to suppress were raised again during trial and were again overruled
by the trial court, we will consider the evidence adduced at the suppression
hearing and relevant trial evidence.  

Search By
Private Citizen Issue

            As
a preliminary matter raised by appellant, we address
the issues concerning the application of the Fourth Amendment in light of the
fact that it was Rogers, a private citizen, who performed the conduct at
issue.  The Fourth Amendment protects the
right of the people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures.  U.S.
Const. amend. IV.  For purposes of the Fourth Amendment,
a search occurs when the government violates a subjective expectation of
privacy that society considers objectively reasonable.  See Kyllo
v. United States, 533 U.S. 27, 33, 121 S.Ct.
2038, 150 L.Ed.2d 94 (2001).  The Fourth Amendment applies only to
governmental action, not to action by a private individual who is not acting as
an agent of the government or with the knowledge and participation of a
government official.  See United
States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct.
1652, 80 L.Ed.2d 85 (1984).  Even a wrongful search or seizure by a private
citizen does not deprive the government of the right to use evidence obtained
from the wrongful search.  See Walter
v. United States, 447 U.S. 649, 656, 100 S.Ct.
2395, 65 L.Ed.2d 410 (1980).

            The
government may not encourage conduct by private persons that the government
itself cannot do, and if the government encourages a search, or the private
citizen searches solely for the purpose of aiding in law enforcement, the
search is illegal.  See
Coolidge v. New Hampshire, 403 U.S. 443, 48788, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).  To determine whether a person is acting as an
instrument or agent of the government, we determine (1) whether the government
knew of, and acquiesced in, the intrusive conduct; and (2) whether the party
performing the search intended to assist law enforcement efforts or, instead,
to further his own ends.  Dawson v. State, 106 S.W.3d 388, 392 (Tex.App.Houston
[1st Dist.] 2003, no pet.).

            From
the record, it would appear that Rogers was acting as an instrument of the
State, and the State makes no contention to the contrary.  Although it is unclear whether DeLuna drove Rogers to the residence or whether Rogers
drove himself, the record is clear that DeLuna called
Rogers and asked him to come to that certain address to see if the person at
the residence was the driver of the vehicle he witnessed at the scene of the
accident.[5]  There is no indication that Rogers came to
the residence and looked in the window on his own accord or to further his own
ends.[6]  That said, we agree with appellant and
analyze the identification procedure in terms of the Fourth Amendment.

Standing

            Proof
of a reasonable expectation of privacy is at the forefront of all Fourth
Amendment claims.  Kothe v. State, 152
S.W.3d 54, 59 (Tex.Crim.App. 2004).  Any defendant seeking to suppress evidence
obtained in violation of the Fourth Amendment must first show that he
personally had a reasonable expectation of privacy that the government
invaded.  Id. (citing Rakas v. Illinois, 439 U.S. 128, 139, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).  A defendant must prove that he or she was a
victim of the unlawful search or seizure and has no standing to complain
about the invasion of someone elses personal rights.  Id. 
Only after a defendant has established standing to complain may a court
consider whether he or she has suffered a substantive Fourth Amendment
violation.  Id.  Although we defer to the trial courts
factual findings and view them in the light most favorable to the ruling, we
review de novo the legal issue of
standing.  Id.

            The
record suggests that the officers at the residence recognized appellants
possessory right to exclude others from the property when, as appellant
directed, the officers left the property for some time to await Rogerss
arrival.  Further, it would appear that
the State recognized appellants possessory interest in the house, having
referred to the residence several times during trial as appellants house.

            Consistent
with the apparent recognition that appellant had, at a minimum, a possessory
interest in the residence, it appears the State never
challenged standing in the trial court. 
That being the case, we are presented with options: (1) we may address
standing as part of appellants Fourth Amendment claim, without regard to
preservation concerns, or (2) we may conclude that the State has forfeited that
argument because it failed to raise it in the trial court.  See Coleman v.
State, 246 S.W.3d 76, 84 n.30 (Tex.Crim.App.
2008); Kothe, 152 S.W.3d at 60, 60 n.15.[7]  Based on the facts presented in this case, we
conclude that, by tacitly recognizing appellants possessory interest in the
property at issue and by failing to raise the issue of standing in the trial
court, the State forfeited its contention that appellant lacked standing to
challenge the search.  

 

 

 

Fourth Amendment Concerns

            Next,
we are called on to determine whether there was a search on these facts.  In other words, we must determine whether the
actions taken by Rogers, as an instrument of the state, invoked the protections
of the Fourth Amendment.

            The
Fourth Amendment protects ones home.  Oliver v. United States, 466 U.S. 170, 176, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); Washington v. State,
152 S.W.3d 209, 214 (Tex.App.Amarillo 2004, no
pet.).  The curtilage,
which is the land immediately surrounding and associated with the home,
warrants the same Fourth Amendment protections that attach to the house.  Oliver, 466 U.S. at
182 n.12.  The protection afforded
a homes curtilage is not unlimited though.  See Washington, 152 S.W.3d at 214.  In
other words, an officers entry onto the curtilage or
approach to the entrances of a residence does not necessarily rise to the level
of a search as contemplated by the Fourth Amendment.  Rodgers v. State, 162 S.W.3d 698, 709
(Tex.App.Texarkana 2005), affd,
205 S.W.3d 525 (Tex.Crim.App. 2006).

            Absent
express orders from a person in possession of property not to trespass, a law
enforcement officer, like any other member of the public, has the right to
enter on residential property and knock on the front door for the purpose of
contacting the occupants.  Cornealius v. State, 900 S.W.2d 731, 73334 (Tex.Crim.App.
1995); Washington, 152 S.W.3d at 214. Because entry is impliedly
authorized, there is no reasonable expectation of privacy with regard to things
observed by those on the pathway to the front door.  Washington, 152 S.W.3d at 214 (citing Bower
v. State, 769 S.W.2d 887, 897 (Tex. Crim. App. 1989)).  While a law enforcement officer may enter
upon the curtilage of a house in an effort to contact
its occupants, the authorization may not exist if the occupant has manifested
his intent to restrict access to the area. 
See id. at 215; Buchanan v.
State, 129 S.W.3d 767, 773 (Tex.App.Amarillo
2004, pet. refd). 

            In
the instant case, the implied authority to approach the house to contact the
occupant had been revoked by appellants directions for the officers to leave
the property.  Here, the record shows
that appellant instructed the officers at his residence to leave his property,
and the record further shows that, upon such instruction, at least some of the
officers complied.  We take appellants
instructions as a manifestation of his intent to restrict access to the
residence.  See Washington,
152 S.W.3d at 215. 
With that, as Rogers approached the residence and stood somewhere in or
near the yard of the back residence[8]
after appellant had directed the officers to leave his property, they no longer
enjoyed the implied authority to approach appellants residence, and neither
did Rogers, acting at their behest.  So,
we will treat the conduct as a search for the purposes of the Fourth
Amendment.  Even assuming that Rogers was
standing on a pathway to which implied authority to approach would apply, once
appellant made clear his intent to restrict access to the property, continued
or further presence on that property was not authorized.[9]

            If
evidence is obtained by an officer or other person in violation of any
provision of the Constitution or laws of the State of Texas or of the
Constitution or laws of the United States, it is not admissible. Tex. Code Crim. Proc. Ann. art. 38.23(a).  Because appellant expressed his intent to
restrict access to the residence and, despite that intent, the officers,
through their instrument, approached his residence, they lacked the authority
to remain on the property, and their presence on the property violated
appellants constitutional right to be free of unreasonable searches.[10]  See U.S.
Const. amends. IV, XIV.

            After
having reviewed the relevant evidence both from the pretrial suppression
hearing and the trial and having concluded that Rogers, acting as an instrument
of the state, lacked authority to be in the position from which he identified
appellant, we conclude that the trial court erred when it denied appellants
motion to suppress evidence of the pretrial identification.

 

 

Harm analysis

            Having
concluded that the trial court erred when it overruled appellants motions to
suppress and keeping in mind that it was evidence of Rogerss pretrial
identification that should have been suppressed, we
turn to a harm analysis.

            We
review the harm resulting from a trial courts erroneous denial of a motion to
suppress and subsequent admission of evidence obtained in violation of the
Fourth Amendment under the constitutional standard of Texas Rule of Appellate
Procedure 44.2(a).  See Hernandez
v. State, 60 S.W.3d 106, 108 (Tex.Crim.App.
2001).  Under Rule 44.2(a), we evaluate
the entire record in a neutral, impartial, and even-handed manner, not in the
light most favorable to the prosecution. 
Harris v. State, 790 S.W.2d 568, 586 (Tex.Crim.App. 1989). 
We must reverse a judgment of conviction and remand for a new trial
unless we determine beyond a reasonable doubt that the error did not contribute
to appellants conviction or punishment. 
Tex. R. App. P. 44.2(a); Hernandez,
60 S.W.3d at 108. 
Constitutional error may, however, be held harmless if there is
overwhelming untainted evidence to support the conviction.  Harrington v. California,
395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284
(1969).  In our analysis, we must
consider the source and nature of the error and its probable collateral
implications, as well as whether declaring it harmless would be likely to
encourage the State to repeat it with impunity. 
Harris, 790 S.W.2d at 587.  We do not focus on the propriety of the
outcome, but calculate, to the degree possible, the probable impact of the
error on the conviction in light of the existence of other evidence.  See Wesbrook
v. State, 29 S.W.3d 103, 119 (Tex.Crim.App.
2000).  We are called on to examine the
likelihood that the constitutional error was actually a contributing factor in
the jurys deliberations in arriving at its verdict, that is, whether the error
adversely affected the integrity of the process leading to the
conviction.  Scott
v. State, 227 S.W.3d 670, 690 (Tex.Crim.App.
2007) (citing Harris, 790 S.W.2d at 587).  Our primary concern is whether there is a
reasonable possibility that the error might have contributed to the
conviction. Mosley v. State, 983 S.W.2d 249, 259 (Tex.Crim.App. 1998).

            Appellant
contends that he was harmed by the admission of evidence of Rogerss
identification because Rogers was the sole identification witness available to
the State that would show appellant was driving the vehicle at the time of the
accident.  Rogers did identify appellant in
court.  Rogerss identification was
consistent throughout the investigation and trial, and he testified that his
in-court identification was based on his interaction and observation of
appellant at the scene of the accident, independent of any visit to appellants
residence the day of the accident.  That
Rogers also identified appellant through a window at appellants house is
cumulative of his in-court identification.

            Further,
we have testimony from DeLuna regarding his
familiarity with appellant through appellants relationship with DeLunas brother.  He
testified that he recognized the green Cavalier as the vehicle he had seen
appellant drive on previous occasions. 
The record also shows that DeLuna learned at
the scene that the abandoned vehicle was registered to appellants father.  With respect to the identification element,
there was a great deal of other evidence pointing to appellant as the missing
driver.  Based on the volume and
probative value of this other evidence, we conclude there is no reasonable
possibility that the error might have contributed to appellants conviction,
and we hold the trial courts erroneous denial of appellants motion to
suppress to be harmless.  See Mosley,
983 S.W.2d at 259.

In-Court Identification

            In
addition to his direct challenge to the procedure leading to Rogerss pretrial
identification, appellant relies on the impropriety of that procedure to
challenge Rogerss in-court identification. 
Appellant also attacks Rogerss pretrial identification of appellant as
an impermissibly suggestive show-up procedure. 
He maintains that the pretrial identification was tainted by law
enforcements impermissibly suggestive show-up procedure and was the product of
only a partial view at some distance and extensive priming by law enforcement
that strongly suggested to Rogers that the man he was about to see was, in
fact, the missing driver.  The taint of
this procedure, appellant seems to contend, extended to Rogerss in-court
identification of appellant, making it inadmissible as well.

Applicable Law

            Appellant
relies on the reasoning in Webb v. State, 760 S.W.2d 263, 269 (Tex.Crim.App. 1988), to support his position.  In Webb, the Texas Court of Criminal
Appeals observed that [a] pretrial identification procedure may be so unnecessarily
suggestive and conducive to mistaken identification that to use that
identification at trial would deny the accused due process of law.  Id. (citing Stovall v. Denno, 388 U.S. 293, 87 S.Ct.
1967, 18 L.Ed.2d 1199 (1967)). That is to say, an in-court
identification is inadmissible if it has been tainted by an impermissibly
suggestive pretrial identification procedure. 
See Ibarra v. State, 11 S.W.3d 189,
195 (Tex.Crim.App. 1999).  However, it is the substantial likelihood of
misidentification that may be engendered by such suggestive procedure that
works the deprivation of due process.  Webb,
760 S.W.2d at 269. 
Therefore, if the totality of the circumstances reveals no substantial
likelihood of misidentification, despite a suggestive pretrial procedure,
subsequent identification testimony will be deemed reliable.  Id. 
And reliability is the linchpin in determining the admissibility of
identification testimony.  Manson v. Brathwaite, 432 U.S. 98,
114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Barley
v. State, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995); Webb, 760 S.W.2d
at 269.

            A
defendant who claims that an in-court identification
is inadmissible due to improper out-of-court identification procedures must
show that (1) the procedures used were impermissibly suggestive and (2) the
procedures gave rise to a substantial likelihood of irreparable
misidentification.  Webb,
760 S.W.2d at 269; Williams v. State, 243 S.W.3d 787, 789 (Tex.App.Amarillo 2007, pet. refd).  A defendant bears the burden of establishing
by clear and convincing evidence that the pretrial identification procedure was
impermissibly suggestive.  Barley, 906 S.W.2d at 3334; Harris v. State, 827
S.W.2d 949, 959 (Tex.Crim.App. 1992).  In making a determination as to whether a
very substantial likelihood for irreparable misidentification has been created,
we consider several non-exclusive factors: (1) the witnesss opportunity to
view the criminal act, (2) the witnesss degree of attention, (3) the accuracy
of the description of the suspect, (4) the level of certainty at the time of
confrontation, and (5) the time between the crime and confrontation.  Barley, 906 S.W.2d at 3435 (citing Neil
v. Biggers, 409 U.S. 188, 93 S.Ct.
375, 34 L.Ed.2d 401 (1972)). 

Standard of Review

            Whether
the trial court erred in admitting into evidence a witnesss identification of
the accused involves a mixed question of law and fact.  Loserth v. State, 963 S.W.2d 770, 772 (Tex.Crim.App.
1998); Williams, 243 S.W.3d at 789.  The factors used to determine whether an
impermissibly suggestive identification procedure gives rise to a substantial
likelihood of irreparable misidentification are treated as historical issues of
fact and are viewed in the light most favorable to the trial courts ruling.  Loserth, 963 S.W.2d at 773. 
We, therefore, afford great deference to the trial courts resolution of
the historical facts pertinent to the case; however, whether the historical
facts render the identification unreliable is reviewed de novo.  See id.
at 77374; Williams, 243 S.W.3d at 789.

Impermissibly suggestive

            An
in-field show-up procedure is generally considered to be suggestive, to some
degree.  See Wilson
v. State, 267 S.W.3d 215, 217 (Tex.App.Waco
2008, pet. refd) (generally considered to be
impermissibly suggestive); Stewart v. State, 198 S.W.3d 60, 63 (Tex.App.Fort Worth 2006, no pet.) (carries a
degree of suggestiveness); Pace v. State, 986 S.W.2d 740, 744 (Tex.App.El Paso 1999, pet. refd)
(dubious because of its suggestiveness); see also Williams, 243
S.W.3d at 78990 (reviewing an in-field show-up procedure and observing that,
under Delk v. State, 855 S.W.2d 700,
706 (Tex.Crim.App. 1993), it is possible that such
a method was impermissibly suggestive). 
We will assume, without deciding, that the show-up identification
procedure used in the instant case was impermissibly suggestive and focus on
the second prong of the Barley test: whether, under the totality of the
circumstances, there was a very substantial likelihood of irreparable
misidentification.  See Williams,
243 S.W.3d at 789 (observing that, even if the procedure used was possibly
impermissibly suggestive, such a conclusion does not end the inquiry).

Very Substantial Likelihood of
Irreparable Misidentification

            Again,
to determine whether the suggestive identification procedure created a very
substantial likelihood of irreparable misidentification, we consider the
non-exhaustive factors outlined in Barley, 906 S.W.2d at 35.  We first note that Rogers had a good
opportunity to view the criminal act. 
Rogers first came into contact with appellant when appellant clipped
Rogerss motorcycle.  Then, Rogers
watched the more serious collision between appellant and Beltran.  Rogers came to the accident scene and spoke
with appellant.  He directed appellant to
stay at the scene and also refused appellants requests that Rogers not call
the police.  Rogers testified that he was
in appellants presence for five to seven minutes before appellant left the
scene.  He added that he was between
three and four feet of appellant at one point during that time period and that
he was about seven feet from appellant when Rogers made the call to 9-1-1.  The accident occurred midday on what Rogers
described as a nice, clear day.

            With
respect to Rogerss degree of attention, we note that he expressed concern
about the status of the drivers upon arriving at the scene.  His concern would suggest that his attention
was focused on the individuals involved in the accident, though it perhaps
became more focused on the nonresponsive Beltran.[11]

            When
DeLuna arrived, Rogers provided him a description of
the driver as a Hispanic male, 56 to 57 in height, with black hair and a
medium build, wearing a blue shirt and denim jeans.  DeLuna confirmed
that appellant met Rogerss description. 
Appellant points out that Rogers failed to note the extensive tattoos on
appellants arms.  Nonetheless, it
appears that Rogers description was an accurate one, and serves to add indicia
of reliability to Rogerss identification.

            Rogers
has never equivocated on his identification of appellant, neither at the
residence nor at the time of trial. 
During his trial testimony, Rogers was certain, regardless of any
observation of appellant at the residence, that appellant was the driver.  We cannot discount the fact that Rogers
testified that his in-court identification was based solely on what he had
observed at the scene of the collision.  See
Barley, 906 S.W.2d at 35.

            We
do note that it appears that trial was held about two years after the accident,
a relatively long time frame which could weigh in favor of appellants
position.  However, considering the
detail and certainty of Rogerss testimony on this matter, it would seem that
the time elapsed had no recognizable effect on
Rogerss in-court identification.  See
id.  In light of the other indicia
of reliability, we do not consider the time between the collision and the
confrontation conclusive.

            We
conclude that, on these facts, the indicia of reliability of the in-court
identification outweigh the apparent corrupting effect of any unnecessarily
suggestive pretrial identification procedure. 
See Harris, 827 S.W.2d at 959.  Because appellant failed to prove by clear
and convincing evidence that the pretrial identification procedure was so
impermissibly suggestive that it posed a very substantial risk of
misidentification, the trial court did not err in admitting Rogerss in-court
identification.  We overrule appellants
second point of error.

Conclusion

            Having
overruled appellants points of error, we affirm the trial courts judgments of
conviction.

 

 

                                                                                                Mackey
K. Hancock

                                                                                                            Justice

 

Publish.  











[1]
See
Tex. Penal Code Ann. § 49.04(a)
(West 2003), § 49.09(b)(2) (West Supp. 2010).

 





[2]
See
Tex. Transp. Code Ann. § 550.021(c) (West Supp. 2010).





[3]
The record is not clear on how far away Rogers
was from the window when he identified appellant as the driver.  Rogers testified that he was about ten to
fifteen feet away from the residence.  An
officer testified that Rogers was probably twenty feet away from the
window.  Yet another officer present at
the residence testified that Rogers was as close as one to three feet away from
the window when he identified appellant.





[4]
See
Tex. Code Crim. Proc.
Ann. art. 38.23 (West 2005).





[5]
DeLuna could not recall if he or any other officer escorted
Rogers closer to the house.  If an
officer did accompany Rogers, the record does not clearly identify who that
officer was.

 





[6]
The record shows that Rogers did not complete an
accident report in connection with superficial damage to his motorcycle as a
result of the minor collision with the Cavalier immediately before the
collision between Beltran and the Cavalier. 
Such evidence would suggest that he had no personal interest in locating
the driver.





[7]
Both Coleman and Kothe
quote United States v. Price, 54 F.3d 342, 346 (7th Cir. 1995), for the
proposition that, because Rakas principle of
standing is rooted in the substantive law of the Fourth Amendment and not
Article III [jurisdiction of courts], the government may waive these types of
standing objections.





[8]
The record suggests that Rogerss position lay
within the curtilage of that residence.  Whether his position was on the pathway to
approach the residence is less clear and complicated by the fact that there
were two houses in the immediate area. 
The front residence, a portable structure of some variety, was located
on a circular drive and the residence in which appellant was located was behind
the front residence.

 





[9]
The State does not advance any other
justification for the warrantless search. 
It relies, instead, on the implied authorization for Rogers to approach
the residence.  The State does not
contend that the search was justified by exigent circumstances or was otherwise
a legally justified warrantless search. 
It instead maintains that there was no search because Rogers stood on
the circle drive leading to appellants residence and that they were authorized
to be there by implication.

 





[10]
Further, appellant contends, the conduct
violated state law.  If evidence is
obtained by officers as a result of a criminal trespass, that evidence must be
suppressed.  See
Martin v. State, 67 S.W.3d 340, 344 (Tex.App.Texarkana
2001, pet. refd).  Criminal trespass occurs when a person enters
or remains on property after being notified that entry is forbidden or received
notice to depart but failed to do so. Tex.
Penal Code Ann. § 30.05(a)
(West Supp. 2010). 
Written or oral notice, fencing, signs forbidding entry, purple paint
marks on trees or posts, and crop cultivation all effectively place a person on
notice that entry is forbidden.  See
id. § 30.05(b)(2).

 





[11]
Further, in response to defense counsel sidebar
comment on Rogerss amazing recall, Rogers responded with an explanation that
his previous experience as a certified pharmacy technician demanded that he
have good recall.